(75 South. 577)

## BLUE v. FIRST NAT. BANK OF ELBA.
### (4 Div. 660.)

(Supreme Court of Alabama. April 19, 1917. Rehearing Denied May 24, 1917.)

**1. TRIAL ☞33—BURDEN OF PROOF.**

A party is under no obligation to prove the case of his adversary, and a party on whom there is no burden of proof may rest his case upon the weakness of his adversary's evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 85, 86.]

**2. USURY ☞113—SUIT TO REDEEM MORTGAGE —BURDEN OF EXPLANATION.**

In suit to redeem under a mortgage, where plaintiff averred that the debt was in large part usurious, and defendant bank's original contract was usurious, and the operations whereby renewals of the debt to a third person were effected indicated that they were under the entire control of the bank or its officers, the burden of explanation was on the bank.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 308–323.]

**3. USURY ☞117—EVIDENCE—FAILURE TO EXAMINE WITNESS—INFERENCES.**

In suit to redeem under a mortgage, where the mortgagee bank had effected renewals through its employé, who knew the facts and was at time of trial without financial interest in the question of usury, failure to examine him weighed against the bank, rather than against the mortgagor.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 328–340.]

**4. USURY ☞18—LOAN IN GOOD FAITH TO PAY USURIOUS DEBT.**

A loan made in good faith and at a legal rate of interest to enable the borrower to pay a debt owed to a third person is not affected by usury inhering in the original debt.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 31–34, 36–38, 40.]

**5. USURY ☞34 — RENEWAL OF USURIOUS DEBT.**

If an original debt in fact persists through renewals, having been usurious in its inception, the taint abides in it, and will affect it through all its renewals and mutations, and follow it, into whose hands soever it may come, unless the holder receives it through the fraud of the debtor; and where a mortgagor, on suggestion of the mortgagee bank, borrowed at legal interest from the bank's employé a sum of money wherewith he paid the mortgage debt, which was usurious, the transactions constituting a mere device of the bank to avoid usury, the fact that the mortgagor supposed he was paying his debt to the bank did not relieve the new contract of its usurious character.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 83–89.]

**6. USURY ☞15—REQUISITES.**

To constitute usury, the borrower must enter into an obligation the effect of which is to bind him to pay more than legal interest.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 27–29.]

**7. MORTGAGES ☞121 — ITEMS CHARGEABLE AGAINST MORTGAGOR—RENEWAL.**

Where a mortgagor bought fertilizers through the mortgagee bank from a mercantile firm, the bank giving the mortgagor a credit for the purpose and entering the charges on its books, the items were chargeable by the bank against the mortgagor under a renewal mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 237–241.]

Appeal from Chancery Court, Coffee County; O. S. Lewis, Judge.

Suit by J. D. Blue against the First National Bank of Elba. From a decree dismissing the bill, complainant appeals. Reversed, rendered in part, and remanded.

H. L. Martin, of Ozark, and J. A. Carnley, of Enterprise, for appellant. W. W. Sanders, of Elba, for appellee.

SAYRE, J. Appellant Blue filed his bill to redeem under a mortgage he had made to appellee, averring that the debt which the mortgage purported to secure was in large part usurious and that in other large part the consideration upon which it was given was illegal. On hearing the pleading and proof the chancellor dismissed appellant's bill.

After a duly careful consideration of the evidence in this cause the court finds the salient evidential facts to be as follows: In March, 1910, appellant was indebted to appellee, according to the latter's computation, in the sum of $10,328.67, of which $7,500, approximately, was secured by mortgages on appellant's farm lands, live stock, and farming implements, and crops to be grown. As for the balance of the above-named total, it consisted of debts to appellee bank due primarily from tenants on appellant's lands, but secured also by appellant's personal indorsement, and in considerable part it was made up of charges for money that had been advanced by appellee to appellant for the purchase of fertilizers. Moreover, appellant was indebted to the bank in the sum of $500 or $600 on account of overdrafts. The debt had been accumulating during a number of years and had been renewed from time to time. That it was largely swollen by usury is not seriously denied. As for the charges for fertilizers, appellant insists that they should be eliminated from the mortgage debt for the reason that the bank had no power under its charter, nor any license from the state, to sell fertilizers. Later we will revert to this point.

Considering in the first place the question of usury as affecting the result of this cause and the facts relevant and material thereto: J. E. Henderson and L. A. Boyd were the principal owners of the appellee bank at Elba, Boyd being its president. These same parties owned also a saw-milling plant at Richburg in the same county, where Boyd was general manager. At the latter place

they had in their employment as bookkeeper a young man, named Scott, who had been with them since he was 22 or 23 years of age; i. e., for 6 or 7 years. Before the date above mentioned the bank had pressed Blue for payment of his debts; but Blue had no money. Nor had he acquaintance with or knowledge of Scott. Appellee's cashier, Powell, suggested to Blue that he apply to Scott for a loan with which to discharge his mortgages to the bank and provide some money with which to take up the overdraft and run him during the current year. Blue testifies that Powell told him that the bank had made arrangements with Scott to take up his (Blue's) indebtedness to the bank, and that, upon his inquiring, "What is that for? To break me up?" Powell said, "No, that Scott was to take up appellant's indebtedness to the bank, and what he failed to pay Scott, the bank would take it up, and that appellant should not be hurt; that that was the bank's way of doing business." The most significant part of this is denied by Powell, but it is not denied that between them they prepared a letter, which was signed by Blue and sent to Scott, asking for a loan of $11,575. In reply Scott offered to make the loan, leaving the sufficiency of the security and all other details entirely to Powell. On March 10, 1910, Blue executed a mortgage for $12,734 upon his lands, live stock, farming implements, crops for three years next in the future, and rents to become due to him from his tenants for four years, due and payable November 15, 1910, and on the next day (March 11th) received Scott's check on the bank for $11,575, which he deposited to his credit with the bank. On March 21, 1910, he gave the bank a check on account of "sundry Mtg." for $10,328.67. Powell testifies that the Blue mortgages to the bank, to which we have heretofore referred, were on the last-named dates marked "Paid." However, they remained in possession of the bank until they were produced by Powell on his examination as a witness in this cause. On November 4, 1910, Boyd wrote a letter from Richburg to Powell at Elba, inclosing the Scott mortgage and saying:

"Better notify the Doctor"—meaning Blue— "that you have the mortgage and Mr. Scott will expect it paid when it is due."

On December 14th, thereafter, Blue gave to Powell a check for $1,400, payable to Scott, which the latter on the next day indorsed to the order of "L. C. Powell, Cashier." On April 13, 1911, the bank took a mortgage from Blue to secure the payment of $12,500, payable December 1st thereafter, and covering substantially the same property as Blue's previous mortgages. On the same day Blue drew in favor of Scott a check on the Bank of Elba for $11,792.40. Scott indorsed this check to Boyd, the latter indorsed it to Powell, and on April 25th it was marked by the bank "Paid." Blue has never seen Scott, nor has any communication passed between them

on the subject of the alleged indebtedness. The entire business has been carried on through Powell.

On these facts, stated thus in outline merely, we conclude that Scott, in lending, or pretending to lend, money to Blue with which to redeem the mortgages held against him by the bank, acted as a mere dummy or cat's paw for the bank, and hence that the operations by which the mortgages the bank held against Blue on March 10, 1910, were transmuted into the mortgage of April 13, 1911, were nothing more in legal effect than a renewal of Blue's indebtedness to the bank.

Powell's testimony is pointed to as being wholly and necessarily inconsistent with the conclusion stated above. We are not of that opinion. Without speculating upon possible reservations with which his testimony was given, it may be conceded that his entire testimony was literally true, without necessarily impeaching the conclusion which has forced itself upon our minds. It was not at all necessary to the plan that Powell should know its meaning at the time. He testified that the mortgages of date prior to March 10, 1910, were marked "Paid" on March 21st, as we have stated. This may be conceded, though it is singular that they were not turned over to Blue as discharged. He also testified that Scott had in the bank the money he lent to Blue, and offered to submit the bank's books to appellant for inspection. The full purport of this testimony was—at least it did not necessarily mean more than— that at the time of the transaction between Scott and Blue the former had a credit of the indicated amount on the books of the bank. Appellant's failure to call for the books can be attributed only to irresolution or extreme caution, for he knew nothing of what the books would show. On the other hand, if the books showed anything more than a credit prepared for the emergency, it is singular that appellee failed to put so valuable a piece of evidence squarely before the court, to show how and when Scott, who, except for the implications of the transaction in question, does not appear to have been a man of any means, got his credit for the large sum of money would have been very much in point.

Scott had gone to Georgia before this cause came on for trial, and was there interested in a business concern known as the Knox-Scott Company. Whether that was a large or small concern does not appear. Appellee refers to the fact that appellant sent an attorney to Georgia to interview Scott, with a view, of course, to taking his testimony, if it promised to be favorable, and comments on appellant's failure to examine Scott. We do not know what Scott may have said to the attorney. His relations to the litigated question and the parties to this cause have appeared. If there was a scheme to relieve the contract of its taint of usury by a merely colorable purchase of it by Scott and a sale

back to appellee, Scott was a party to it. And there were probably other reasons why he might not be expected to volunteer information against his former employers. For these reasons we think it may be correctly said that he was more accessible to the bank than to Blue. The rule of such cases and its philosophy has been expressed by Chief Justice Stone in the following language:

"There is a rule, and a just one, that if a party has a witness possessing peculiar knowledge of the transaction, and supposed to be favorable to him, and fails to produce such witness when he has the means of doing so, this, in the absence of all explanation, is ground of suspicion against him that such better informed testimony would make against him." Carter v. Chambers, 79 Ala. 223, 231.

[1-3] We recognize the rule that a party is under no obligation to prove the case of his adversary and that a party on whom there is no burden of proof may, and frequently does, rest his case upon the weakness of his adversary's evidence. In the present case appellee's original contract with appellant was certainly usurious. The operations by which the transmutations of the debt were effected bear such persuasive indications that all along they were under the entire control of appellee or its officers—badges of fraud, they may not inaptly be termed—that the burden of explanation was cast upon appellee. Appellee's case rested upon the prima facie appearance of the papers and the testimony of Powell and Boyd. We have referred to the testimony of Powell. Boyd was content to say generally that the bank had no interest in the transaction between Scott and Blue, and that he knew of it only from his discussion of it with Powell. He explained the fact that Scott had indorsed Blue's check for $11,792.40 to him by saying that it was so indorsed "in the regular course of business." It may be presumed that any bias that may have affected Scott would incline him to the side of appellee; but he knew the facts, he was then without financial interest in the question at issue, and it would seem that the failure to examine him should weigh rather against appellee. Hence our conclusion stated above.

[4-6] A loan made in good faith, and at a legal rate of interest, for the purpose of enabling the borrower to pay a debt owed to a third person, is not affected by usury that may inhere in the original debt. May v. Folsom, 113 Ala. 198, 20 South. 984. But it is familiar law that, if the original debt in fact persists and was usurious in its inception, the taint abides in it, and will affect it throughout all its renewals and mutations, and follow it into whose hands soever it may come, unless the holder receives it through the fraud of the debtor. Pearson v. Bailey, 23 Ala. 537; Masterson v. Grubbs, 70 Ala. 406. "And there is no device or shift on the part of the lender to evade the statute under or behind which the law will not look in order to ascertain the real nature of the transaction." Lukens v. Hazlett, 37 Minn. 441, 35 N. W. 265. So far as concerns Blue, we have no doubt that by his transaction with Scott he intended to pay his debt to the bank, principal and usury; and if there had been a bona fide novation—a new debt created, payable at a legal rate of interest to Scott for his use and benefit—and the novated debt had been transferred to the bank, the plea of usury could avail appellant nothing. But if the several transactions constituted together a mere device on the part of the bank and for its use and benefit to avoid usury, which the laws of the state and of the United States alike penalize by the forfeiture of all interest—and we have so found on the evidence—then the fact that Blue for his part supposed he was borrowing money from Scott with which to discharge his debt to the bank, principal and usury, whereas the new obligation, though in form running to Scott, in fact belonged from the beginning to the bank, being in truth nothing more than a renewal of the old one, in these circumstances the fact that he supposed he was paying his debt to the bank cannot avail to relieve the new contract of its usurious character. Laws against usury are enacted to protect the weak and necessitous. The lender alone violates the law, and against him alone are its penalties enacted. While, under our decisions, to constitute usury, the borrower must enter into an obligation the effect of which is to bind him to pay more than legal interest, and so it is commonly said that to render a contract usurious both parties must be cognizant of the fact constituting usury, it would be strange that the only party who could violate the law, and has intentionally done so, could escape its penalty by reason of a device by which he has deceived the borrower and concealed from him the fact that he was taking usury—that the borrower's new contract was nothing more than a renewal of the old, usury included. Lukens v. Hazlett, supra.

[7] The true nature of the transaction with Scott established as aforesaid, appellant also contends that a certain large part of the debt secured by the terms of appellee's mortgage should be taken without its security for the reasons stated at the outset. The best judgment we have been able to reach on this point is that these fertilizers were sold, not by the bank, but by the mercantile firm of L. A. Boyd & Co., probably through the bank, which gave Blue a credit for that purpose and entered the charges on its books. These items are therefore chargeable against appellant under the mortgage now held against him by the bank.

The decree dismissing appellant's bill will be reversed, a decree will be rendered here declaring appellant to be entitled to relief against all interest charges on his mortgage debt, and the cause will be remanded for a

decree of reference and for further proceedings in accord with this opinion.

Reversed, rendered in part, and remanded.

ANDERSON, C. J., and McCLELLAN and GARDNER, JJ., concur.